IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 114,675

STATE OF KANSAS,
*Appellee*,

v.

DARRELL BROXTON,
*Appellant*.

SYLLABUS BY THE COURT

1.

It is not legally appropriate to instruct a jury on an uncharged crime unless it is a lesser included offense of a charged crime.

2.

When a district court permits evidence of prior crimes or bad acts under K.S.A. 60-455, exculpatory evidence related to the same prior crime or bad act is relevant.

3.

A defendant may claim the benefit of developments in the law occurring while his or her case is pending on direct appeal.

Review of the judgment of the Court of Appeals in an unpublished opinion filed November 9, 2017. Appeal from Wyandotte District Court; J. DEXTER BURDETTE, judge. Opinion filed April 17, 2020. Judgment of the Court of Appeals affirming the convictions, vacating the sentence, and remanding the case is affirmed in part and reversed in part. Judgment of the district court is affirmed in part, the sentence is vacated, and the case is remanded with directions.

*Korey A. Kaul*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Ethan Zipf-Sigler*, assistant district attorney, argued the cause, and *Jose V. Guerra*, assistant district attorney, *Mark A. Dupree Sr.*, district attorney, and *Derek Schmidt*, attorney general, were on the briefs for appellee.

The opinion of the court was delivered by

STEGALL, J.: Darrell Broxton appeals from his second-degree murder, burglary, and felony theft convictions. Broxton claims the district court committed three reversible errors by (1) failing to give a felony-murder instruction; (2) excluding from evidence a document from a Florida homicide investigation; and (3) improperly scoring Broxton's prior Florida burglary conviction as a person felony.

As discussed below, we reverse the Court of Appeals' holding that a district court may elect to provide a felony-murder instruction when that crime was not charged. As such, we affirm the district court's finding that the instruction was not legally appropriate. We agree with Broxton, however, that the district court erred when it refused to admit the exculpatory document from the Florida homicide investigation into evidence on the ground it was not relevant. But, in light of the State's case at trial, we hold this error was harmless. Finally, we conclude Broxton's prior Florida burglary conviction must be scored as a nonperson felony.

FACTUAL AND PROCEDURAL BACKGROUND

In December 2012, Peter Belmont was found dead in his home. Belmont died as a result of trauma to the back of his head. Numerous items were missing from Belmont's home, including his van. Investigators discovered DNA evidence on a bottle of bleach

2

and a bottle of orange juice left at the scene. Later testing indicated that one of the samples contained a mixed DNA profile consistent with Broxton and the other sample contained Broxton's DNA.

Several weeks after Belmont's body was found, police pulled over Belmont's van. One of the passengers, Clifford Harris, said he had rented the van from James Hunter and Brian Keatings. Harris later identified Broxton as the man he knew as Brian Keatings. When questioned, Hunter told police that in December, Broxton had picked him up in the same van filled with televisions, stereos, and laptops. According to Hunter, he and Broxton sold several of those items and exchanged the van for crack cocaine.

Police then discovered several items from Belmont's home at Broxton's apartment, including Belmont's stereo, various Sony-branded sound equipment, a red and black Amsterdam pen, cologne, an NYU logo sweatshirt, a pair of slacks, a belt, a notebook, an envelope, a piece of paper, and a business card. The NYU sweatshirt was blood-stained in three places. DNA testing of one sample yielded a partial major profile consistent with Broxton's DNA. Another sample contained both Broxton's and Belmont's DNA.

During an interrogation, Broxton admitted he knew Belmont and claimed that he and Belmont had had a consensual sexual encounter in Belmont's van. But Broxton denied taking Belmont's possessions and claimed the items in his apartment were left by a former roommate or were purchased at Goodwill.

In addition, the investigation revealed that Broxton's mother's and sister's phones, which Broxton often used, had been used to call Belmont's number between November 1 and December 5, 2012. After December 5, the calls ceased. The calendar hanging in Belmont's kitchen included an entry noting "Darrell over" on December 5, 2012.

The State charged Broxton with first-degree premeditated murder; burglary of Belmont's van; felony theft of the van; and misdemeanor theft of Belmont's electronic equipment, clothes, and a pen. At trial, the district court instructed the jury on first-degree premeditated murder and the lesser included offense of second-degree intentional murder. Ultimately, a jury convicted Broxton of second-degree murder, burglary, and felony theft.

ANALYSIS

*It was not error to refuse to give a felony-murder jury instruction.*

At trial, Broxton requested a felony-murder instruction. Broxton told the court he knew "it was not charged that way, . . . but there [was] certainly evidence that there was property taken." He continued that a jury could reasonably "consider this to be a robbery and a death occurring during a robbery, which would . . . satisfy the requirements to find felony murder as opposed to premeditated first[-]degree murder."

The district court denied Broxton's request, ruling that a felony-murder instruction was inappropriate because the State only charged Broxton with first-degree premeditated murder. Because felony murder is not a lesser included offense of first-degree premeditated murder, the district court reasoned that such an instruction would not be appropriate.

The Court of Appeals considered Broxton's claim and held that "[c]aselaw indicate[d] that there was no legal impediment to the trial court giving a felony murder instruction here." *State v. Broxton*, No. 114,675, 2017 WL 5184435, at *4 (Kan. App. 2017) (unpublished opinion). It explained that "felony murder is not a lesser included offense of first-degree premeditated murder," but "a trial court *may* instruct the jury on

4

felony murder even though the State only charged the defendant with premeditated first-degree murder." 2017 WL 5184435, at *4. The Court of Appeals explained that even though the district court may elect to do so, the district court is under no duty to instruct for felony murder under those circumstances. 2017 WL 5184435, at *5. It relied upon *State v. Young*, 277 Kan. 588, Syl. ¶ 4, 87 P.3d 308 (2004), which held that "'[t]he fact that felony murder is not charged in an information does not preclude an instruction when evidence supports the instruction and the defendant is not unfairly surprised by the prosecution's reliance on that theory.'" *Broxton*, 2017 WL 5184435, at *4.

Finding that a felony-murder instruction "may be so instructed if the facts call for giving the instruction," the Court of Appeals examined the facts and held that such an instruction was not factually appropriate. 2017 WL 5184435, at *5-6. The panel concluded that none of the evidence indicated that Belmont's murder took place during the robbery. *Broxton*, 2017 WL 5184435, at *6. Thus, because the killing was not part of the res gestae of the robbery, the killing could not be felony murder.

Broxton petitioned this court for review, claiming the Court of Appeals erred when it held that a felony-murder instruction was not factually appropriate. The State cross-petitioned, arguing that the Court of Appeals erred when it held that a felony-murder instruction was legally appropriate.

When analyzing jury instruction claims, we first determine whether we "'can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal.'" *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018). Next, we consider the claim's merits "'to determine whether error occurred below.'" 307 Kan. at 317. Finally, if error occurred at the district court, we ask whether that "'error requires reversal, *i.e.*, whether the error can be deemed harmless.'" 307 Kan. at 317. The error determination requires us to consider whether the instruction was legally and

factually appropriate. Appellate courts exercise unlimited review when determining whether an instruction was legally appropriate. *State v. Johnson*, 304 Kan. 924, 931, 376 P.3d 70 (2016).

The issue was properly preserved. Thus, we first consider whether the requested instruction was legally appropriate, and only if the answer is "yes" will we move on to a consideration of whether it was factually appropriate. A legally appropriate jury instruction "'fairly and accurately state[s] the applicable law, and an instruction that does not do so [is] legally infirm.'" *State v. Murrin*, 309 Kan. 385, 392, 435 P.3d 1126 (2019).

The panel below held that the district court did not have a "duty" to provide a felony-murder instruction but suggested that if it elected to do so, such an instruction could have been legally appropriate. The Court of Appeals held this despite conceding that felony murder is not a lesser included offense of first-degree premeditated murder. *Broxton*, 2017 WL 5184435, at *5-6. The panel cited our *Young* decision to support its conclusion that the trial court could have instructed the jury on felony murder even though the State only charged Broxton with first-degree premeditated murder. *Broxton*, 2017 WL 5184435, at *4-5.

In *Young*, the defendant was charged with premeditated first-degree murder. The district court, however, without a request from either party but also without objection, gave a felony-murder instruction. The jury ultimately convicted Young of felony murder. On appeal, Young argued the felony-murder instruction was reversible error. *Young,* 277 Kan. at 593-97.

The *Young* court began its analysis by observing that the felony-murder instruction "was not a correct statement of Kansas law, because felony murder is not a 'lesser offense' of premeditated first-degree murder." 277 Kan. at 593. But the *Young* court permitted the instruction, after concluding that "the evidence presented at trial was

6

plainly sufficient to support Young's felony-murder conviction." 277 Kan. at 596. Thus, even though the "misstatement was literally [erroneous]" it was not "'clearly erroneous' because the remainder of the instruction's content and its inclusion in the case were proper." 277 Kan. at 594. Thus, the court concluded it was "not error to have the jury consider a felony-murder theory in the alternative to a premeditation theory, even though felony murder had not been described in the information." 277 Kan. at 594.

The decision in *Young* predates the more streamlined and precise framework for analyzing jury instructions this court adopted in 2012 in *State v. Plummer*, 295 Kan. 156, 283 P.3d 202 (2012). Prior to *Plummer*, appellate review of jury instruction claims was decidedly more scattershot. To remedy these inconsistencies, we enumerated a four-step analysis appellate courts still follow. 295 Kan. at 160-63 (listing the now-familiar steps of considering [1] reviewability; [2] legal appropriateness; [3] factual appropriateness; and [4] harmlessness).

We often state that our caselaw considering jury instruction questions published prior to *Plummer*'s recalibration is less reliable than its post-*Plummer* counterparts. See, e.g., *Foster v. Klaumann*, 296 Kan. 295, 301, 294 P.3d 223 (2013) ("This court recently held that its prior decisions applied an 'imprecise' standard of review for jury instruction issues and set forth an analytical framework with accompanying standards of review to promote greater consistency."); *State v. Tague*, 296 Kan. 993, 1009, 298 P.3d 273 (2013) ("[W]e observed that our past caselaw tended to blend or conflate the determinations of appellate reviewability, error on the merits, and reversibility of the error."). This history colors our view of *Young* and its precedential value.

It is helpful to note, though, that the *Young* court did analyze the legal appropriateness of the felony-murder instruction and concluded that "[t]he felony-murder instruction given in Young's case was not a correct statement of Kansas law, because

7

felony murder is not a 'lesser offense' of premeditated first-degree murder." *Young*, 277 Kan. at 593. The *Young* court plainly held that the felony-murder instruction was not legally appropriate. The analysis should have stopped there.

Instead, the *Young* court then proceeded to an analysis of the instruction's factual appropriateness:

> "Here, the evidence presented at trial was plainly sufficient to support Young's felony-murder conviction. At the time of the murder, Young was involved in the sale of cocaine, which is listed as an inherently dangerous felony. Young was carrying a gun; he threatened to shoot Horn if Horn turned the key in the car's ignition; and he shot into the car five times when the drug deal soured. [Citation omitted.]" 277 Kan. at 596-97.

Finally, the *Young* court addressed reversibility, holding that there was "no reasonable possibility that the jury would have rendered a different verdict if the district court had not made the mistake of calling felony murder a 'lesser offense' of premeditated murder." 277 Kan. at 597.

When considered in isolation, our decision in *Young* does support the notion that a defendant may be convicted of a crime that was never charged and is not a lesser included offense of any charged crime. But, when viewed through the *Plummer* lens, the misstep in *Young* becomes apparent. Under our current analytical framework, the district court was correct when it denied Broxton's request for a felony-murder instruction. This is because it does not matter whether such an instruction might have been factually appropriate. If an instruction is not legally appropriate the analysis ends there.

Moreover, permitting the district court to provide jury instructions for crimes the State did not charge (or their lesser included offenses) would upset the basic structure of criminal trials. Judge Atcheson's concurring opinion below summarizes succinctly:

8

"[A] criminal defendant has no right to have a jury instructed on crimes the State has refrained from charging, save for lesser included offenses of those crimes that actually have been charged. The State functionally has unbridled control over what to charge against a given defendant—that's the essence of prosecutorial discretion. . . . Whatever the reasons, the call belongs to the State. A defendant has no correlative right to insist a jury be instructed on uncharged crimes even if the trial evidence tends to establish them. That would contravene prosecutorial discretion. [Citation omitted.]" *Broxton*, 2017 WL 5184435, at *12 (Atcheson, J., concurring).

We agree with Judge Atcheson.

Because the State did not charge Broxton with felony murder—and felony murder is not a lesser included offense of any crime he was charged with—a felony-murder instruction was not legally appropriate in this case. Given this, we will not consider whether such an instruction would have been factually appropriate.

*The district court erred by excluding the Florida "No Information" document from evidence, but the error was harmless.*

Next, Broxton takes issue with the district court's exclusion from evidence of an exhibit originating in Florida referred to as a "No Information" document. At trial, the State had produced evidence of a 1996 Florida homicide. A Florida police detective testified to details in that case which closely mirrored Belmont's homicide. These facts included: the Florida murder victim was an older homosexual man; the victim often had homosexual indigent male visitors; these visitors often were drug users; the crime scene showed no signs of forced entry; the victim was struck in the head with a hammer; police discovered blood spatter on the walls and ceiling; a TV and VCR were missing from the victim's house; the victim's vehicle was taken; and a water glass was left behind at the scene. *Broxton*, 2017 WL 5184435, at *3. While Florida authorities issued a warrant for Broxton's arrest, Broxton was never formally charged with the crime. The State also

9

admitted a taped interview of Broxton by Florida police in 1998. On the tape, Broxton admits to knowing the Florida victim and being at the victim's house smoking crack cocaine when the Florida victim died. Broxton claims in the recording that another individual at the house killed the Florida victim.

Broxton objected to the evidence, but the district court admitted it to prove identity under K.S.A. 2019 Supp. 60-455. Having lost that challenge, Broxton sought to mitigate its impact by introducing into evidence a "No Information" document executed by the Florida prosecutor in the case. The document read:

> "'Comes now the State of Florida, by and through its undersigned Assistant State Attorney, and announces that it will file no information in the above entitled cause based on the following grounds:
>
> 'ALTHOUGH PROBABLE CAUSE EXISTED WHICH JUSTIFIED THE ISSUANCE OF THE CIRCUIT JUDGE'S WARRANT, THERE IS INSUFFICIENT EVIDENCE AT THIS TIME TO PROCEED WITH PROSECUTION BECAUSE THE EXCULPATORY STATEMENT MADE BY THE DEFENDANT AFTER THE WARRANT WAS ISSUED CANNOT BE DISPROVED.'" 2017 WL 5184435, at *7.

The trial court denied the admission of the No Information document on the grounds that it was not probative and therefore was irrelevant. The court found "the allegations in Florida . . . are uncannily similar to the actions [Broxton was] accused of here in Kansas. What the prosecutor decides to do or has decided to do with the evidence in front of them in Florida is irrelevant."

The Court of Appeals held that the evidence was relevant and that it was error to exclude it. 2017 WL 5184435, at *8. The panel reasoned that "evidence that Broxton did not commit one of the murders is evidence he did not commit either of the murders.

10

Broxton denied that he was the perpetrator of either offense. That Broxton was never charged because of insufficient evidence is not dispositive but certainly relevant." 2017 WL 5184435, at *8. Nonetheless, the Court of Appeals found the error was harmless. 2017 WL 5184435, at *8. These rulings are challenged by both parties. Broxton seeks to overturn the panel's harmlessness conclusion, while the State urges us to reverse the finding of error.

"'Evidence is probative if it furnishes, establishes, or contributes toward proof. Probativity is reviewed for abuse of discretion.'" *State v. McCormick*, 305 Kan. 43, 47, 378 P.3d 543 (2016). A district court abuses its discretion when its action is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) is based on an error of fact. *State v. Ingham*, 308 Kan. 1466, 1469, 430 P.3d 931 (2018).

The district court believed the No Information document was not probative because it did not decisively state that Broxton was innocent of that crime. Instead, the No Information document only indicated that the State of Florida lacked evidence sufficient to charge Broxton. The district court found this distinction dispositive. The Court of Appeals held the evidence was "certainly relevant," implying that the district court's ruling was unreasonable. *Broxton*, 2017 WL 5184435, at *8. We agree. The district court believed evidence potentially implicating Broxton in a Florida homicide was probative to prove the material fact of identity. It should follow that evidence tending to show the State of Florida's inability to charge Broxton would be probative of disproving that same material fact. Thus, in these circumstances, the district court abused its discretion when it ruled that the No Information document lacked probative value and ruled it inadmissible.

Having decided the district court erred when it excluded the No Information document, we must consider the resulting prejudice, if any. We review any erroneous exclusion of evidence under the harmless error test enumerated in K.S.A. 2019 Supp. 60-

11

261 "which asks whether 'there is a reasonable probability that the error did or will affect the outcome of the trial in light of the entire record.'" *State v. Burnett*, 300 Kan. 419, 434, 329 P.3d 1169 (2014) (quoting *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 [2011]).

Reviewing the record, we hold that any prejudice resulting from the document's exclusion was harmless. It is unlikely that the inclusion of the document would have swayed the jury. The No Information document did not vouch for Broxton's innocence in the Florida homicide—it only stated that Florida prosecutors lacked sufficient evidence to charge Broxton "at th[at] time." *Broxton*, 2017 WL 5184435, at *7.

In light of the entire record, it is highly unlikely that this single document proclaiming the State of Florida's inability to charge Broxton for the homicide would have persuaded jurors to change their votes. This is in part because the identity evidence from the Florida homicide painted a convincing picture. Both the Florida homicide victim and Belmont associated with indigent drug users, engaged in sexual relationships with those drug users, and died of trauma to the head from multiple strikes leaving behind similar blood spatter evidence. Both crime scenes lacked signs of forced entry and had various types of electronic equipment, including televisions, stolen from them. Beverage containers recovered at each scene contained Broxton's DNA. In both cases, the victim's vehicle was taken from the scene and later linked to Broxton.

More important, however, even if we were to concede the district court's evidentiary error tainted the entirety of the State's Florida identity evidence, the remaining evidence against Broxton was overwhelming. Broxton was identified as the individual who was driving Belmont's van while it was filled with items similar to items stolen from Belmont's home. Police discovered Belmont's stereo equipment, pen, sweatshirt, and other belongings in Broxton's apartment. Broxton admitted to police he had been in Belmont's van. The sweatshirt had a spot containing one partial major profile

12

consistent with Broxton's DNA, and two spots containing Broxton's DNA mixed with Belmont's DNA. Cell phones Broxton had access to frequently made phone calls to Belmont's number, but those calls ceased after December 5, 2012—the same day marked as "Darrell over" on Belmont's kitchen calendar. Finally, DNA evidence consistent with Broxton's DNA was recovered from a bleach bottle at the scene, and Broxton's DNA was found on the orange juice bottle left behind.

The State's case at trial was significant and convincing. In light of all these considerations, we are confident in determining that the evidentiary error was harmless.

*The 1989 Florida burglary conviction must be scored as a nonperson felony.*

After sentencing, the State objected to Broxton's presentence investigation report (PSI). The State claimed that a prior 1989 Florida burglary conviction should have been scored as a person felony under amendments to K.S.A. 21-6810(d), 21-6811(c) and (j). The district court agreed and scored the conviction as a person felony. Broxton appealed and claims the offense has been improperly scored because it is not a "comparable offense" under Kansas law.

It is undoubtedly the case that the law used to determine comparable offenses in Kansas has been in a state of flux for several years. Early on, "'[f]or purposes of determining criminal history, the offenses need only be comparable, not identical,'" and a "'comparable offense' was 'the closest approximation' to the out-of-state crime." *State v. Weber*, 309 Kan. 1203, 1206, 442 P.3d 1044 (2019) (quoting *State v. Vandervort*, 276 Kan. 164, 179, 72 P.3d 925 [2003]). But we reconsidered the statutory meaning of "comparable" in *State v. Wetrich*, 307 Kan. 552, 561-62, 412 P.3d 984 (2018). There, we held that "[f]or an out-of-state conviction to be comparable to an offense under the Kansas criminal code, the elements of the out-of-state crime cannot be broader than the

13

elements of the Kansas crime." Put another way, "the elements of the out-of-state crime must be *identical to, or narrower than*, the elements of the Kansas crime to which it is being referenced." (Emphasis added.) 307 Kan. at 562.

Then, in *Weber*, 309 Kan. at 1206, we synthesized several recent developments. We explained that in *State v. Murdock*, 309 Kan. 585, 439 P.3d 307 (2019) (*Murdock II*), we held:

> "'[T]he legality of a sentence under K.S.A. 22-3504 is controlled by the law in effect at the time the sentence was pronounced. The legality of a sentence is fixed at a discrete moment in time—the moment the sentence was pronounced. At that moment, a pronounced sentence is either legal or illegal according to *then-existing law*. Therefore, for purposes of a motion to correct an illegal sentence, neither party can avail itself of subsequent changes in the law.'" (Emphasis added.) *Weber*, 309 Kan. at 1209 (quoting *Murdock II,* 309 Kan. at 591).

Applying this rationale, we held that "*Wetrich* was a change in the law as contemplated by *Murdock II*." *Weber*, 309 Kan. at 1209. We affirmed Weber's conviction on that basis:

> "Before *Wetrich*, no Kansas case construed the term 'comparable' as used in K.S.A. 2018 Supp. 21-6811(e)(3), formerly K.S.A. 21-4711(e), to incorporate the identical-or-narrower requirement. *Vandervort* rejected such a construction when it reviewed a defendant's claim that an out-of-state offense and a Kansas offense could not be comparable since the out-of-state offense was broader, i.e., did not contain a lack-of-consent element required to commit the Kansas crime. . . .
>
> "Under the law at the time of Weber's sentencing, as he concedes, '[f]or purposes of determining criminal history, the offenses need only be comparable, not identical.' In *Murdock II*'s wake, he cannot argue *Wetrich* makes his sentence, which was legal when it was imposed, illegal. [Citations omitted.]" 309 Kan. at 1209.

14

Consistent with this holding, we then made it clear that *Wetrich* is "inapplicable to sentences finalized before *Wetrich* was decided." *State v. Bryant*, 310 Kan. 920, 453 P.3d 279, 281 (2019).

After this dust had settled, Broxton—while on direct appeal—made a *Wetrich* claim before us for the first time. And on the merits, he is correct. We have already decided that the Florida burglary statute does not create a comparable offense and therefore it must be scored as a nonperson felony. *State v. Buell*, 307 Kan. 604, 608, 412 P.3d 1004 (2018) (Comparing K.S.A. 2011 Supp. 21-5807 to Fla. Stat. § 810.02 [2002] and concluding that "[m]any alternative means may have supported the mental state element for the Florida adjudications . . . that would not have been any kind of burglary in Kansas" and therefore "the Florida burglary adjudications were not comparable to the Kansas offense of burglary.").

Our only obstacle to providing relief to Broxton on this claim is the fact that he raised it for the first time on appeal. The vehicle of a motion to correct an illegal sentence is unavailable to him because his sentence was legal when pronounced. See *Bryant*, 453 P.3d at 281; *Weber*, 309 Kan. at 1209; *Murdock II*¸ 309 Kan. at 591; *Wetrich*, 307 Kan. at 562. We recently considered this precise issue in *State v. Williams*, 311 Kan. __, 456 P.3d 540 (2020).

During Williams' appeal, he argued for the first time, based on and citing to *Wetrich*, that his sentence was illegal because the district court had incorrectly scored an out-of-state conviction as a person crime. *Williams*, 456 P.3d at 544. When we addressed the illegal sentence claim, we explained that "*Murdock II* and *Weber* preclude Williams from arguing that he received an illegal sentence" because:

"At the time Williams was sentenced, out-of-state convictions were classified as nonperson or person crimes depending on whether Kansas had a 'comparable' offense in effect on the date the current crime was committed. At the time of Williams' sentencing in July 2015, the meaning of 'comparable' was defined as the 'closest approximation.'

"Under this standard of 'comparable,' Williams' Mississippi unnatural intercourse conviction was comparable to aggravated criminal sodomy, a person felony. According to our decision in *Murdock II*, Williams cannot argue *Wetrich* makes his sentence, which was legal when it was imposed, illegal. [Citations omitted.]" 456 P.3d at 546.

But our analysis did not stop here. We explained that several avenues are available for relief. 456 P.3d at 546 ("But claiming an illegal sentence . . . is not a defendant's only recourse."). We noted that under *Murdock II*, "'a party may seek and obtain the benefit of a change in the law during the pendency of a direct appeal.'" *Williams*, 456 P.3d at 546 (quoting *Murdock II*, 309 Kan. at 591-92). "And while Williams' case was pending on direct appeal, a change in our law occurred regarding the definition of 'comparable' as stated in K.S.A. 2015 Supp. 21-6811(e)(3)." 456 P.3d at 546-47.

We gave Williams the benefit of the change in law announced in *Wetrich* and described it as correcting a "sentencing *error* (as opposed to an illegal sentence)." *Williams*, 456 P.3d at 547. We summarized the uniqueness of the situation this way: "because Williams' case is pending on direct appeal, he is entitled to the benefit of a change in the law. Because *Wetrich* changed the law governing Williams' sentence, even though *Wetrich* did not render that sentence illegal, it did render Williams' sentence erroneous." *Williams*, 456 P.3d at 548.

Because our caselaw establishes that the Florida burglary statute prohibits a broader range of conduct than the Kansas statute, they do not create comparable offenses.

16

As such, Broxton's sentence—though legal at the time—still constitutes error and he must be resentenced correctly with his Florida burglary conviction scored as a nonperson felony.

We affirm the district court's convictions but vacate the sentence and remand Broxton's case to the district court for resentencing consistent with this opinion.

NUSS, C.J, not participating.[1]

PATRICK D. MCANANY, Senior Judge, assigned.[2]

---

[1]**REPORTER'S NOTE:** Chief Justice Lawton R. Nuss heard oral arguments but did not participate in the final decision in case No. 114,675. Chief Justice Nuss retired effective December 17, 2019.

[2]**REPORTER'S NOTE:** Senior Judge McAnany was appointed to hear case No. 114,675 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court by the retirement of Justice Lee A. Johnson.